DEALERS TRANSPORT COMPANY, Inc.,
Appellant,

v.

BATTERY DISTRIBUTING COMPANY,
Inc. and General Dynamics Cor-
poration, Appellees.

BATTERY DISTRIBUTING COMPANY,
Inc., Appellant,

v.

GENERAL DYNAMICS CORPORATION,
Appellee.

Court of Appeals of Kentucky.

June 4, 1965.

As Modified on Denial of Rehearing
May 13, 1966.

James W. Hendricks, Thomas W. Speckman, Gavin H. Cochran, Marshall, Cochran, Heyburn & Wells, Louisville, for Dealers Transport Co. Inc.

Wm. A. Miller, Louisville, for Battery Distributing Co. Inc.

Fielden Woodward, Robert P. Hobson, Woodward, Hobson & Fulton, Louisville, for General Dynamics Corp.

DAVIS, Commissioner.

The appellant, Dealers Transport Company, suffered property damage when a fire on its premises caused an explosion of acetylene gas. This action was instituted by Dealers against appellee Battery Distributing Company (the jobber from whom appellant obtained the acetylene tanks in controversy) and against appellee General Dynamics Corporation (the company which had manufactured the acetylene gas and

injected it under pressure into the tanks). Hereafter we shall refer to appellant as Dealers, and to the appellees as Battery (jobber) and General (manufacturer). The damage claims were premised alternatively on the theories of negligence and breach of implied warranty.

The trial court granted summary judgment absolving General (the manufacturer) from liability. The case was submitted to a jury with respect to Dealer's claim against Battery; the jury found for Battery. Appellant presents five assignments of error: (1) The trial court erred in granting summary judgment for General; (2) appellant is entitled to judgment n. o. v. against General; (3) the court erred in submitting contributory negligence of appellant as a defense; (4) the court erred in imposing an inspection duty upon appellant; (5) the court should have granted judgment n. o. v. for appellant against Battery.

There is an appeal by Battery against General; this appeal is properly prosecuted as a precautionary measure, since Battery had cross-claimed against General for indemnity in the event it should be held liable to Dealers. Since the judgment on the verdict granted no relief against Battery the court dismissed Battery's cross-claim against General. Battery's appeal seeks reversal of that portion of the judgment in the event it should be determined that Battery is liable to Dealers. We consider and dispose of both appeals herein.

After all evidence was in the trial court sustained Battery's motion for a directed verdict as to the *negligence* theory, but submitted the case to the jury on breach of implied warranty of fitness.

In the afternoon of Friday, February 26, 1960, appellee Battery delivered to Dealers five large oxygen tanks, two large acetylene tanks and one small acetylene tank; all of these tanks, filled with pressurized gas, had been obtained from General by Battery. There was no privity of contract between Dealers and General.

The tanks were delivered and set in place by a servant of Battery. For purposes of this opinion we need give attention only to the one small acetylene tank and one large one which stood next to it. These two tanks were put in place along the wall of Dealers' welding shop, and were positioned about two inches apart. The small tank was at the head of a line of tanks and the large one rested immediately alongside it. The tanks were not moved from their respective positions from the time they were so placed by Battery's servant until the fire and explosion involved in this case.

At 11:30 p. m. on Monday, February 29, 1960, Dealers' employee Irvin Bledsoe began his duties; his task required his use of an electric arc welder with which he proposed to weld a reinforcement plate on a trailer. Bledsoe was situated "about twelve to thirteen" feet from the acetylene tanks as he welded. It was nearly midnight when Bledsoe started using the welder. He had continued the welding for about twenty minutes when he found it necessary to go to the back of the room to increase the amperage on the welding machine. In going to make this adjustment Bledsoe passed within one foot of the tanks but observed nothing unusual about them. He did not hear any sound of escaping gas, nor did he detect the odor of acetylene. The witness stated that he likely could not have heard the sound of escaping gas anyway due to the greater volume of noise emanating from the welding machine.

When Bledsoe returned from adjusting the amperage (the exact time he consumed in this is not revealed) he discovered flames approximately six to eight inches high around the bottom of the large acetylene tank. Bledsoe then left the room to notify his foreman of the fire; in a very brief time he and the foreman arrived at the site of the fire; then the flames enveloped the large tank and had obtained height of "about halfway up the building." Bledsoe said that the small tank was "white hot," although no flame emanated from it. After a quick appraisal of the situation

Bledsoe and Smith, the foreman, decided that they should run from the scene, which they did. Almost immediately the small tank burst; thereupon there was an explosion of the acetylene which had been released from the smaller tank. The consequent property damage was extensive; the parties stipulated that the damages exceeded $15,000.00.

It was shown that it is a prevailing custom to engage in arc welding activities in confined areas containing tanks of acetylene. Bledsoe stated that an asbestos blanket was available, but that it had not been used to protect the acetylene tanks; he stated that the asbestos blanket was never used for such purposes, but was used when welding was being done on a vehicle equipped with a gasoline or fuel tank. Another witness said the asbestos blanket was used only to protect paint on vehicles on which welding was being performed. Bledsoe said that hot sparks and slag will (and did on the occasion of the fire) fly from fifteen to eighteen feet from the point of welding. However, Bledsoe was quite positive that nothing lay on the floor near the acetylene tanks which could have been the ignition point of the fire.

It was shown in evidence that acetylene tanks (including the tanks involved in this case) are provided with four fusible plugs, as a safety factor. Two plugs are located near the base and two at points higher on the tank. These plugs are so designed as to melt when subjected to heat at 212 degrees Fahrenheit. The structure of the tank is such that it is to be able to withstand much higher temperatures, thus the plugs should permit the gas to escape before the tank will burst because of increased internal pressure.

It is the contention of appellant that one of the lower plugs on the larger tank extruded and permitted acetylene to escape. According to this theory, the extrusion of the plug resulted from a defective condition in the plug. The escaping gas was ignited, reasons appellant, and the heat from its combustion was so intense that the contents of the smaller tank expanded until that small tank burst; then it was that the released acetylene exploded into flame and damaged appellant's property. Under this theory, the appellant contends that the fusible plugs on the small tank failed to function according to their intended purpose, and that had they worked properly the acetylene would have been released slowly from the small tank without the consequent violent eruption. In short, it is appellant's claim that the fusible plug or plugs on the big tank improvidently permitted the gas to escape too soon and the plugs on the small tank held the gas too long.

There is unanimity among the witnesses that all four of the fusible plugs on the big tank had released when examined after the fire. It appears that none of the four plugs on the small tank had opened sufficiently to permit acetylene gas to escape from the tank, although one witness for Battery expressed the view that one of the plugs in the small tank had "relieved." In the words of the witness, a plug in the small tank "had blown, but not as clean a blow"; he explained that traces of tin alloy left in the fusible plug indicated to him that there had not been a "clean blow."

After the fire witnesses examined the large tank, but could find no holes or ruptures in it, there was a bulge in the large tank, but the only openings through which the gas could have escaped, said the witness, were those occurring when the safety plugs "relieved."

Qualified witnesses for appellant expressed the view that the safety plugs in the small tank should have functioned by reason of the heat from the fire around the large tank. It was explained that the igniting temperature of acetylene is about 850 degrees Fahrenheit as compared to 212 degrees at which the fusible plugs should have opened. Furthermore, the small tank was designed to withstand having its contents heated to 500 degrees without rup-

ture. From this it was reasoned by the appellant's witnesses that ample heat existed for sufficient time to cause the small tank's safety plugs to open.

A witness for the appellee Battery stated that he could ascribe only three hypotheses as explanatory of the extrusion of the safety plug on the large tank: (a) Rough handling, (b) application of heat, and (c) the plug was defective. As noted, the tank was delivered and placed in position by Battery's servant; there was no showing that any rough handling occurred while the tank was in appellant's plant. There was no evidence that any gas had leaked from the tank, so far as its presence could have been detected by its odor or its escaping sound, up to the very moment of the blaze.

■ For Battery it is argued that the evidence for appellant did not warrant submission of the case to the jury, so that all of the other questions are academic. In light of this, we deem it appropriate to first discuss the point whether the evidence created a jury issue. We hold that a jury issue was presented as to whether the tanks were defective when delivered to Dealers, and whether the damages proximately resulted from any such defects. As outlined above, there was no evidence warranting a conclusion that any employee of Dealers (or any other person) had disturbed the tanks from the time of their delivery until the fire occurred. It was also specifically stated in evidence that there was no waste or other combustible material in the vicinity of the tanks. It was shown that no evidence of leaking acetylene had been observed prior to the fire, although witnesses said that the odor of acetylene would have been discerned by them. Since a leaking plug in the big tank was the only place from which acetylene could have emanated, the evidence establishes a reasonable probability that the fire was caused by reason of the escaping acetylene gas. This is enough. See Kentucky Power Co. v. Halcomb, Ky., 373 S.W. 2d 725; Beatrice Foods Co. v. Chatham,

Ky., 371 S.W.2d 17; Bell & Koch, Inc. v. Stanley, Ky., 375 S.W.2d 696.

It is our view that it was error to grant summary judgment ·in favor of General. As noted, the apparent reason for granting the summary judgment was the lack of privity between Dealers and General. In a well-reasoned opinion, this Court said in C. D. Herme, Inc. v. R. C. Tway Co., Ky., 294 S.W.2d 534, that an ultimate consumer could maintain action based on *negligence* against a remote manufacturer. The claim in Herme was not predicated upon any theory of warranty.

In Berger v. Standard Oil Co., 126 Ky. 155, 103 S.W. 245, 11 L.R.A.,N.S., 238, this court denied recovery on an *express* warranty as it related to a claimant who was a stranger to the warranty (an ultimate consumer). In the course of the opinion in the Berger case the court adverted to the principle that liability of a manufacturer to an ultimate consumer must be denied, even if the manufacturer was negligent, "unless either the article is an imminently dangerous one, or the seller has knowledge of its defects, and that they are such as to endanger life or property without notice or warning of the defects." This principle was reaffirmed and somewhat extended in Olds Motor Works v. Shaffer, 145 Ky. 616, 140 S.W. 1047, 37 L.R.A., N.S., 560. However, the latter case was expressly overruled in Herme, just cited.

We are unable to perceive a valid basis for requiring privity of contract in a products liability claim based on breach of implied warranty and disregarding privity in such claims based on negligence. We are mindful that true contractual liability appropriately requires privity; the pragmatic view impels us to recognize that recovery against a remote vendor in this type case, even when based on implied warranty, truly sounds more in tort than in contract. It must be recognized that the rule allowing recovery against the remote vendor in products liability cases had its genesis in

broad policy, in which the courts recognized the practical necessity for fixing responsibility even upon defendants who had had no direct dealing with the claimant—contractual or otherwise.

In Vol. 1, Products Liability, Hursh, § 6:84, this jurisdiction is listed as one committed to the rule that privity is required in breach of warranty cases. In support of that text are cited Berger v. Standard Oil Co. (1907), 126 Ky. 155, 103 S.W. 245, 11 L.R.A.,N.S., 238, and Schultz v. Tecumseh Products (CA 6 Mich.), 310 F.2d 426. The Berger case actually involved an express warranty, and is not authority for the rule applicable to an implied warranty.

The decision in Schultz v. Tecumseh Products, supra, is one in which the United States Court of Appeals expressed its views as to what the law is in Kentucky concerning the requirement of privity as a prerequisite to a claim based on breach of implied warranty. That respected sister jurisdiction concluded that the decisions of this court clearly align this jurisdiction with those requiring privity in such cases. The federal court pointed to our decisions in Prater v. Campbell, 110 Ky. 23, 60 S.W. 918 (1901); Hall Mfg. Co. v. Purcell, 199 Ky. 375, 251 S.W. 177 (1923); J. I. Case Threshing Machine Co. v. Dulworth, 216 Ky. 637, 641, 287 S.W. 994 (1926), and Berger v. Standard Oil Co., 126 Ky. 155, 103 S.W. 245 (1907). These cases, noted the Sixth Circuit Court of Appeals, had been decided prior to Kentucky's adoption of the Uniform Sales Act in 1928. Four Kentucky cases decided since the adoption of the Uniform Sales Act were then discussed: Nehi Bottling Co. v. Thomas, 236 Ky. 684, 33 S.W.2d 701 (1930); Hieronymous Motor Co. v. Smith, 241 Ky. 209, 43 S.W.2d 668 (1931); North American Fertilizer Co. v. Combs, 307 Ky. 869, 212 S.W.2d 526 (1948), and Caplinger v. Werner, Ky., 311 S.W.2d 201 (1958). The majority opinion of the Schultz v. Tecumseh Products decision, supra, concluded that Kentucky's decisions establish that privity is a pre-requisite to recovery for breach of implied warranty. However, in a well-reasoned dissenting opinion, U. S. Circuit Judge Weick took a contrary view. Judge Weick reasoned that the impact of C. D. Herme, Inc. v. R. C. Tway Co., Ky., 294 S.W.2d 534 (particularly in light of the authorities urged by the dissenting members of this court in that case) was to do away with the privity requirement, whether in negligence cases or in implied warranty cases. 74 A.L.R.2d, p. 1195, is cited in support of the view taken by Judge Weick. It suffices to observe that the status of the law in this jurisdiction appears to be vague enough to warrant exactly opposite interpretations of it by distinguished jurists of another tribunal.

We think we would do no judicial violence to hold that the law in this jurisdiction is that privity is *not* a prerequisite to maintenance of an action for breach of implied warranty in products liability cases, upon the authority and reasoning enunciated in Henningsen v. Bloomfield Motors, 32 N.J. 358, 161 A.2d 69, 75 A.L.R.2d 1. However, we are persuaded to the view expressed in Section 402A of the American Law Institute's revised Restatement of the Law of Torts approved in May, 1964, which provides:

"§ 402A. Special Liability of Seller of Product for Physical Harm to User or Consumer

(1) One who sells any product in a defective condition unreasonably dangerous to the user or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

    (a) the seller has exercised all possible care in the preparation and sale of his product, and

    (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

This view of "strict liability" has obtained recent and substantial acceptance in the jurisdictions of this country. See, for example, Greenman v. Yuba Power Products, Inc., 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P. 2d 897 (1963); Goldberg v. Kollsman Instrument Corp., 12 N.Y.2d 432, 240 N.Y.S. 2d 592, 191 N.E.2d 81 (1963); Santor v. A. & M. Karagheusian, Inc., 44 N.J. 52, 207 A.2d 305 (1965); Suvada v. White Motor Co., 32 Ill.2d 612, 210 N.E.2d 182 (1965); and Ford Motor Co. v. Lonon, Tenn., 398 S.W.2d 240. We hold, therefore, that it was error to award summary judgment in favor of General.

■ The same rule of "strict liability" is as applicable to Battery as it is to General. The issues submitted to the jury as between Dealers and Battery were not based on "strict liability" concepts, although liability was imposed, subject to certain exceptions. It is our view that the trial court erroneously instructed the jury, and that the instructions were sufficiently prejudicial to Dealers to require reversal.

The court gave the following instruction:

"(1) If you believe from the evidence that the two acetylene cylinders concerning which you have heard evidence, or either of them were defective at the time they were delivered to plaintiff, and that as a direct and proximate result of said defect, if any, the large cylinder was caused to leak acetylene gas, which ignited, and that as a result of the heat from said fire the smaller cylinder exploded, causing the damages, and that said defects, if any, were not readily apparent, then the law is for the plaintiff, and you will so find. Unless you so believe, or if you believe as set out in Instruction No. 2, the law is for the defendant, and you will so find."

The court gave a separate instruction directing the jury that Battery would be absolved from liability by contributory negligence of Dealers.

■ The first instruction was not warranted by the evidence, as there was no showing that any defect in either tank was "readily apparent." The fusible plugs in each tank were substantially obscured from view as the top two were under a metal cap and the lower two situated within the concave base of the tank. There was no duty on Dealers to make a full blown inspection (which would have been required to have even a glimpse of the plugs). Cf. Snead v. Waite, 306 Ky. 587, 208 S.W.2d 749. Hence, it was improper to instruct the jury as to "readily apparent" defects.

■ Neither was there sufficient evidence to warrant submission of contributory negligence of Dealers. We need not explore the numerous authorities dealing with the basic question whether contributory negligence is ever a proper defense in products liability cases based on breach of warranty, since the liability here is not upon warranty. It suffices to say that the evidence adduced upon the trial failed to establish activity of Dealers which could be characterized as contributory negligence or misuse of the product. In the absence of such proof, it was prejudicially erroneous to submit that question to the jury.

What we have said does not mean that Dealers is entitled to a directed verdict against either Battery or General. Rather, we conclude that the evidence for Dealers is sufficient to permit submitting to the jury whether the fire and consequent dam-

ages proximately resulted from a defect in an acetylene tank existing when the tank was delivered to Dealers. The quantum of evidence for Dealers is not such as to entitle it to a directed verdict, but is enough to submit to the jury. Bell & Koch, Inc. v. Stanley, Ky., 375 S.W.2d 696.

The judgment is reversed upon the appeal of Dealers against Battery and General with directions to grant a new trial; the judgment is reversed upon the appeal of Battery against General for such further proceedings therein as may appear appropriate in light of the new trial.